UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
HECTOR SANCHEZ,                      :      15 Civ. 4914 (PGG) (JCF)

             Plaintiff,              :            REPORT AND
                                            RECOMMENDATION
      - against -                    :
                                     :
COMMISSIONER OF SOCIAL SECURITY,     :

             Defendant.              :
- - - - - - - - - - - - - - - - - -:
TO THE HONORABLE PAUL G. GARDEPHE U.S.D.J.:

```
┌─────────────────────────────────┐
│ USDS SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____            │
│ DATE FILED: 8/2/16               │
└─────────────────────────────────┘
```

     The plaintiff, Hector Sanchez, brings this action pursuant

to section 205(g) of the Social Security Act (the "Act"), 42

U.S.C. § 405(g), seeking review of a determination of the

Commissioner of Social Security (the "Commissioner") finding

that he is not disabled for purposes of entitlement to

Supplemental Security Income ("SSI").   The Commissioner has

filed a motion for judgment on the pleadings pursuant to Rule

12(c) of the Federal Rules of Civil Procedure, which the

plaintiff did not oppose.   For the reasons that follow, I

recommend granting the Commissioner's motion.

Background

     A. Personal and Vocational History

     Mr. Sanchez was born on May 12, 1967, and filed his

application for SSI benefits on November 18, 2011, when he was

44 years old.[1]  (R. at 150, 156).  In school, Mr. Sanchez went as far as the ninth grade, and received vocational training while incarcerated from 1996 to 2002.  (R. at 23-24, 179).  Mr. Sanchez has not worked full-time since 1992.  (R. at 157, 178). Since the alleged onset of his disability, Mr. Sanchez has worked some "odd jobs" stocking grocery store shelves.  (R. at 26).  He has never been legally married and has no children. (R. at 156-57).  At the time of his application, Mr. Sanchez lived with his significant other, Lillian Rivera.[2]  (R. at 152-55).  Mr. Sanchez wears a prosthetic right eye as the result of an accident that occurred when he was three years old.  (R. at 347).  He claims he was unable to work because diabetes caused the vision in his left eye to become blurry.  (R. at 27).

B. Medical History

Most of the medical evidence in the administrative record consists of records from two facilities -- Montefiore Medical Center ("Montefiore"), and Lincoln Medical and Mental Health Center ("Lincoln").  The record also includes an internal medicine consultative exam by Dr. William Lathan from December

---

[1] Citations to "R." refer to the Administrative Record that the Commissioner filed with the Court as part of her answer to the complaint.

[2] Hector Sanchez and Lillian Rivera are not legally married; however, the record refers to Ms. Rivera as Mr. Sanchez's wife throughout. (e.g., R. at 154, 156, 280, 288).

23, 2011 (R. at 347-49), and an ophthalmology consultative exam by Dr. Gene Matusow from September 12, 2013 (R. at 356-59).

          1. <u>Montefiore Medical Center</u>

Mr. Sanchez was examined by Dr. Jaishree Kumari at Montefiore on May 6, 2011, and May 25, 2011. (R. at 310, 314). Montefiore released medical records from the two visits, but did not complete a medical assessment form. At the May 6, 2011, exam, Dr. Kumari noted that Mr. Sanchez had a history of drug abuse and was currently taking methadone. (R. at 310). On May 25, she advised him to attend an outpatient medical methadone program. (R. at 315). Dr. Kumari identified no major problems, finding Mr. Sanchez "well developed, well nourished, [and] in no acute distress." (R. at 315). Lab results, dated May 25, 2011, showed that Mr. Sanchez had high liver enzymes, cholesterol, and blood sugar. (R. at 334). They also showed a hemoglobin A1C of 6.9%. (R. at 321). The lab results showed two separate levels of glucose; one of 151 mg/L and one of 199 mg/DL.[3] (R. at 321, 333). On May 26, 2011, Dr. Kumari noted that Mr. Sanchez would start medications, but the record does not specify which ones. (R. at 336).

---

[3] The medical records indicated that a glucose level of more than 126 on two occasions and a hemoglobin A1C greater than 6.5% are consistent with diabetes. (<u>e.g.</u>, R. at 234-35).

2. <u>Lincoln Medical and Mental Health Center</u>

On September 28, 2011, emergency medical services brought Mr. Sanchez to the emergency department at Lincoln due to an altered mental state, hypotensive shock, and severe abdominal pain. (R. at 260, 266, 275). His tongue had black deposits and there was a "dry black liquid around the lips." (R. at 261). Testing revealed blood glucose levels of 387 mg/dL and 926 mg/dL (R. at 260, 267). Dr. Maria Leu, the resident emergency consult, diagnosed Mr. Sanchez with type 2 diabetes with ketoacidosis.[4] (R. at 261). Dr. Leu also noted that the CT of Mr. Sanchez's abdomen was consistent with pancreatitis.[5] (R. at 243). Mr. Sanchez was treated with aggressive fluid resuscitation, intubated for airway protection, and started on insulin. (R. at 260). Dr. Leu performed an emergency procedure to insert a central venous catheter. (R. at 263).

A physical exam, completed at the hospital on September 28, 2011, reported a past history of heroin abuse. (R. at 272).

---

[4] Diabetic ketoacidosis is a life threatening condition that occurs when the body cannot use sugar as a fuel source because there is not enough insulin. <u>Diabetic Ketoacidosis</u>, https://medlineplus.gov/ency/article/000320.htm (last visited July 21, 2016). Diabetic ketoacidosis is less common in people with type 2 diabetes, but can be triggered by "uncontrolled blood sugar, missing doses of medicines, or a severe illness." <u>Id.</u>

[5] Pancreatitis is inflammation of the pancreas that occurs when digestive enzymes start digesting the pancreas itself. <u>Pancreatitis</u>, https://medlineplus.gov/pancreatitis.html (last visited July 21, 2016).

Ms. Rivera reported that Mr. Sanchez had not been eating or drinking for a few days. (R. at 272-273). During his hospital stay, Mr. Sanchez was on a ventilator to assist with breathing. (R. at 277).

Mr. Sanchez was discharged on October 6, 2011. (R. at 248, 307). The final diagnoses included type 2 diabetes with neurological manifestations, acute pancreatitis, and abdominal pain. (R. at 307). The discharge form noted follow-up appointments at an eye clinic on October 7, 2011, at the surgery clinic on October 12, 2011, and at a gastrointestinal clinic on October 20, 2011. (R. at 307). A referral form, dated October 7, 2011, instructed Mr. Sanchez to see an optometrist in three to four months to "recheck if sugar is ok." (R. at 305). The discharge instructions indicated that Mr. Sanchez was "stable and ambulating" and could "slowly return to usual activities as tolerated." (R. at 307).

Mr. Sanchez was again admitted to Lincoln hospital on October 11, 2011, complaining chiefly of painful swallowing. (R. at 248). A chest CT, dated October 11, 2011, revealed "small patchy densities in the right upper lobe suspicious for

early bronchopneumonia"[6] and the findings raised a "suspicion of esophagitis."[7]  (R. at 245).

On October 12, 2011, Dr. Maria Lola Cevallos noted that Mr. Sanchez had a medical history of diabetes, GERD,[8] and pancreatitis.  (R. at 257).  She also reviewed the resident's exam report and diagnosed Mr. Sanchez with esophagitis and health associated pneumonia due to recent hospital admission. (R. at 257).  Lab results from October 12, 2011 reported a glucose level of 208 mg/dL and a hemoglobin A1C of 12.3%. However, Dr. Cevallos noted that Mr. Sanchez's diabetes was stable.  (R. at 258).  A social work assessment from October 12 indicated that Mr. Sanchez needed assistance with activities of daily living, and that he was not visually impaired.  (R. at 299).

Mr. Sanchez was discharged from the hospital on October 13, 2011.  (R. at 248).  The final diagnoses from that visit

---

[6] Bronchopneumonia is an alternative name for pneumonia, which is an infection in one or both lungs.  Pneumonia, https://medlineplus.gov/pneumonia.html (last visited July 21, 2016).

[7] "Esophagitis refers to any inflammation, irritation, or swelling of the esophagus."  Esophagitis, https://medlineplus.gov/ency/article/001153.htm (last visited July 21, 2016).

[8] Gastroesophageal reflux disease (GERD) occurs when a muscle at the end of the esophagus does not close properly. GERD, https://medlineplus.gov/gerd.html (last visited July 21, 2016).  Stomach contents can leak back into the esophagus and irritate it. Id.

included    esophagitis    and    "diabetes    with    neurological
manifestations, type ii or unspecified type, uncontrolled." (R.
at 250).   His lab results from October 13 indicated a glucose
level  of  137  mg/dL.    (R.  at  237).    The  discharge  orders
indicated that Mr. Sanchez was stable and ambulating, and could
slowly return to his usual activities.  (R. at 249, 308).  They
also indicated that Mr. Sanchez should follow up with podiatry
and ophthalmology examinations in two weeks.  (R. at 250, 308).

On  his  disability  report,  Mr.  Sanchez  reported,  "I  almost
died when I was at Lincoln Hospital. I can barely see. I was in
severe pain when I was admitted into the emergency room."  (R.
at 184).

### 3. William Lathan, M.D.

On  December  23,  2011,  Dr.  William  Lathan  performed  a
consultative  examination  of  Mr.  Sanchez.   (R. at 347).   He noted
that  the  plaintiff  had  a  history  of  diabetes  and  right  eye
blindness.   (R. at 347).   He also recorded that Mr. Sanchez
tested his blood sugar regularly and that it was usually within
the  normal  range.   (R. at 347).   Dr. Lathan noted that the
plaintiff  could  perform  all  activities  of  personal  care,  but
that his wife did all the cooking, cleaning, and laundry.  (R.
at 347).  He found that Mr. Sanchez had 20/20 vision in his left
eye, and that while his right eye was prosthetic, the left eye
was  clear  and  normal.   (R. at 348).   In  summary,  Dr.  Lathan

determined that Mr. Sanchez was stable, with a severe restriction for binocular vision.  (R. at 349).

### 4. Residual Functional Capacity Assessment

On January 5, 2012, K. Henningsen, a Single Decisionmaker of the SSA, completed a Physical Residual Functional Capacity[9] Assessment of Mr. Sanchez.  (R. at 355).  He identified Mr. Sanchez's primary diagnoses as diabetes with hypertension and vision problems.  (R. at 350).  He noted that Mr. Sanchez's blood sugar was usually within normal range and that he was not on insulin at the time of the assessment.  He concluded that Mr. Sanchez could occasionally lift or carry fifty pounds, could frequently lift or carry twenty-five pounds, could stand or walk for six hours in an eight hour day, could sit for six hours in an eight hour day, and had no limitations on pushing or pulling abilities.  (R. at 351).  The assessment noted no postural limitations, manipulative limitations, communicative limitations, or environmental limitations.  (R. at 352-53).  K. Henningsen noted that Mr. Sanchez had 20/20 vision in his left eye, and that any visual limitations applied only to his right

---

[9] Residual functional capacity is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  It is the most a claimant can still do despite his or her limitations.  20 C.F.R. § 416.945(a)(1).  Residual functional capacity is considered during steps four and five of the sequential analysis.  20 C.F.R. § 416.945(a)(5)(i), (a)(5)(ii).

eye.  (R. at 353).  Given Mr. Sanchez's symptoms, K. Henningsen concluded that Mr. Sanchez could manage money, take public transportation, go out alone, and be independent in most activities of daily life.  (R. at 354).

### 5. Gene Matusow, M.D.

Dr. Gene Matusow performed a consultative ophthalmology exam on Mr. Sanchez on August 12, 2013.  (R. at 356).  He found that Mr. Sanchez lost his right eye and used a prosthetic, but that there was "no history of ocular disease, trauma, or surgery involving the left eye."  (R. at 356).  He noted the recent onset of non-insulin dependent diabetes, but stated there was no history of hypertension.  (R. at 356).  Dr. Matusow noted that there was no light perception in the right eye, but that Mr. Sanchez had 20/40 vision in his left eye which could be corrected to 20/20.  (R. at 356).  An examination of the left eye revealed no irregularities or evidence of diabetic retinopathy.[10]  (R. at 357).

### 6. Miscellaneous Records

In the field office disability report from November 2011, the interviewer recorded that Mr. Sanchez had a difficult time signing a form because "he had a hard time seeing."  (R. at

---

[10]  Diabetic retinopathy is the most common diabetic eye disease and can cause blindness. Diabetic Retinopathy, National Eye Institute (NEI), https://nei.nih.gov/eyedata/diabetic (last visited June 20, 2014).

176).  The report also noted that Mr. Sanchez wore sunglasses during the interview and was highly dependent on his wife.  (R. at 176).

Mr. Sanchez completed several forms regarding his medical treatment.  (R. at 216-22).  On a form received June 28, 2012, he listed drugs prescribed on October 13, 2011, including medication for diabetes, high cholesterol, and high triglycerides prescribed by Dr. Zahrat, and medication for stomach pain and heartburn prescribed by Dr. Naranjor.  (R. at 216).  On the same form, Mr. Sanchez claimed surgery was performed at Lincoln Hospital for cellulitis and an abscess of his upper arm and forearm.  (R. at 217).  There was no date for the surgery, and no medical records from Lincoln regarding the surgery are in the record.  On a form received by SSA on March 21, 2013, Mr. Sanchez noted that Dr. Samima Ashraf prescribed him medication for diabetes, high cholesterol, high triglyceride, and heartburn on October 6, 2011.  (R. at 221).

B. Procedural History

The plaintiff filed his application for SSI benefits on November 18, 2011, on the basis of high blood pressure, diabetes, uncontrolled vision problems, and abdominal pain.  (R. at 156, 177-84).  In the application, he indicated that he became disabled on September 28, 2011.  (R. at 178).  After his application was denied on January 6, 2012, he requested review

10

by an Administrative Law Judge ("ALJ").  (R. at 43-47, 49-51).
The initial hearing was held on July 10, 2013, before ALJ Eric
Borda.  (R. at 21).

Mr. Sanchez appeared at the hearing pro se.  (R. at 22).
The ALJ explained that he had medical records from Lincoln,
Montefiore, and from the consultative examination by Dr. Lathan.
(R. at 22).  He asked if there was any additional medical
information he needed to get, and Mr. Sanchez replied, "No."
(R. at 22).  Mr. Sanchez again answered, "No," when asked if
there were conditions other than blindness in his right eye and
diabetes that kept him from being able to work.  (R. at 23).

Mr. Sanchez testified that he had not worked since
September 28, 2011, because of diabetes.  (R. at 24).  He
alleged to be waiting for a job in maintenance when he became
disabled.  (R. at 27).  However, Mr. Sanchez also testified that
he had worked odd jobs stocking grocery stores shelves since
2011.  (R. at 26).  Although he reported that he did not have
difficulty stacking the groceries, Mr. Sanchez claimed that he
could not seek a full-time job in the grocery store due to his
vision.  (R. at 27).  He testified, "Blurry, my vision be [sic]
blurry since I got diabetes.  Sugar goes up and my eyes start
getting blurry and I can't, you know, can't see straight."  (R.
at 27).

Mr. Sanchez testified that he had been seen at Lincoln in January 2013. (R. at 26). He also reported that he had gone to Lincoln for his left eye blurriness, and that the doctors had wanted to perform surgery. (R. at 28). Mr. Sanchez stated that he might have an appointment at Lincoln scheduled for the Monday after the hearing. (R. at 29).

Due to a lack of evidence regarding the blurriness in Mr. Sanchez's left eye, the ALJ decided to conclude the hearing and continue the case before examining a vocational expert. (R. at 29-30). He sent Mr. Sanchez to an ophthalmologist for an eye exam and stated he would send for the additional record from Lincoln Hospital. (R. at 29).

The ALJ conducted a supplemental hearing on January 28, 2014. (R. at 33-39). Again, Mr. Sanchez appeared pro se. (R. at 33). The ALJ reported that he had obtained the medical record from Mr. Sanchez's consultative exam with Dr. Matusow and that it had been added to the record. (R. at 33). When the ALJ asked if there was any additional medical evidence that he wanted to submit, Mr. Sanchez replied, "No. I've been taking a lot of medication." (R. at 34).

The ALJ then called a vocational expert, Marion Maraca, to testify. (R. at 34). The ALJ posed a hypothetical question to the vocational expert, asking her to identify jobs in the economy that an individual of Mr. Sanchez's age, education, and

12

work experience could perform with no exertional limitations. (R. at 36). He limited the available occupations to those that could be performed with monocular vision and without exposure to hazardous machinery and unprotected heights. (R. at 36-37). The vocational expert testified that such an individual would be able to perform the duties of a mini-bar attendant, a porter at a used car lot, and a general worker in lithography. (R. at 37-38). Mr. Sanchez declined the opportunity to question the vocational expert, and the ALJ concluded the hearing. (R. at 39).

On January 31, 2014, ALJ Borda issued a decision finding that the plaintiff was not disabled within the meaning of the Social Security Act during the period beginning on September 28, 2011. (R. at 5-14). The Appeals Council denied Mr. Sanchez's request for review, making the ALJ's decision the final decision of the Commissioner in his case. (R. at 1). The plaintiff filed the present action on June 22, 2015.

Analytical Framework

    A. Determination of Disability

A claimant is disabled under the Social Security Act and therefore entitled to disability benefits if he can demonstrate, through medical evidence, that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423 (d)(1)(A); see also Fernandez v. Commissioner of Social Security, No. 15 Civ. 4500, 2016 WL 3197433, at *3 (S.D.N.Y. June 6, 2016). The disability must be of "such severity that 'the claimant' is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423 (d)(2)(A).

To determine whether a claimant is entitled to disability benefits, the Commissioner employs a five-step sequential analysis. 20 C.F.R. § 416.920(a)(4); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). First, the claimant must demonstrate that he is not currently engaging in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i), (b). Second, the claimant must prove that he has a severe impairment that "significantly limits his physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(a)(4)(ii), (c). Third, if the impairment is listed in what are known as "the Listings," 20 C.F.R. Part 404, Subpt. P, App. 1, or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled. 20 C.F.R. § 416.920(a)(4)(iii), (d). Fourth, if the claimant is unable to make the requisite showing

under step three, he must prove that he does not have the residual functional capacity to perform his past work.  20 C.F.R. § 416.920(a)(4)(iv), (e).  Fifth, if the claimant satisfies his burden of proof in the first four steps, the burden shifts to the Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform.  20 C.F.R. §§ 416.920(a)(4)(v), (g), 416.960(c); Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23 (S.D.N.Y. Jan. 7, 2009) (citing Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).  In order to determine whether the claimant can perform other substantial gainful employment, the Commissioner must consider objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and the claimant's educational background, age, and work experience.  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

B. Judicial Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if he establishes that no material facts are in dispute and that he is entitled to judgment a matter of law.  See Burnette v. Carothers, 192 F.3d

52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 0743, 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Social Security Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A court reviewing the Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence." Geertgens v. Colvin, No. 13 Civ. 5133, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); see also Longbardi, 2009 WL 50140, at *21.

Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008). Second, the court must decide whether the ALJ's decision was supported by substantial evidence. Tejada, 167 F.3d at 773 (2d Cir. 1999); Calvello, 2008 WL 4452359, at *8. "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi, 2009 WL 50140,

16

at *21 (citing <u>Brown v. Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999), and <u>Williams v. Bowen</u>, 859 F.2d 255, 256 (2d Cir. 1988)). Substantial evidence in this context is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Hahn</u>, 2009 WL 1490775, at *6 (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).

<u>Analysis</u>

   A. <u>The ALJ's Decision</u>

   ALJ Borda applied the five-step sequential analysis and concluded that Mr. Sanchez was not disabled on or after the date he filed his application for benefits. (R. at 8-14). He first determined that Mr. Sanchez had not engaged in substantial gainful activity since November 18, 2011, the date of the application. (R. at 10). At step two, he determined that Mr. Sanchez had the following severe impairments: right eye blindness and a history of drug abuse in remission. (R. at 10). He determined that those severe impairments "more than minimally interfere with the claimant's ability to perform basic work activities on a regular and continuing basis." (R. at 10).

   He determined that Mr. Sanchez's diabetes was a non-severe impairment because there was no evidence to suggest that the diabetes was not currently controlled or that it resulted in more than minimal functional limitations. (R. at 10-11). The

ALJ based his conclusions on the opinions of Dr. Kumari and Dr. Lathan, neither of whom observed physical abnormalities during the examinations of Mr. Sanchez. (R. at 10-11). He also depended on the consultative visual exam performed by Dr. Matusow, which found no evidence of diabetic neuropathy. (R. at 11). Finally, the ALJ referenced Mr. Sanchez's own claims that he treats his diabetes only every six months and that his blood sugar is usually within the normal range. (R. at 11).

The ALJ determined that Mr. Sanchez's diagnoses of GERD and pancreatitis were not severe impairments because there was no evidence that the plaintiff was actively seeking treatment for those conditions or that they resulted in more than minimal limitations to his ability to work. (R. 11). The ALJ did not analyze Mr. Sanchez's diagnosis of esophagitis.

At step three, ALJ Borda found that Mr. Sanchez did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments in the Listings. (R. at 11). Specifically, he determined that there was no medical evidence in the record establishing that Mr. Sanchez's impairments met the criteria for loss of central visual acuity (listing 2.02); contraction of the visual field in the better eye (listing 2.03); or loss of visual efficiency, or visual impairment, in the better eye (listing 2.04). (R. at 11).

18

Proceeding to step four, ALJ Borda concluded that the plaintiff had the residual functional capacity to perform a full range of work at all exertional levels with two nonexertional limitations. (R. at 11). He determined that plaintiff should avoid all exposure to hazardous machinery and unprotected heights, and was limited to occupations requiring monocular vision and no peripheral vision on the right side. (R. at 11).

At the final step in his analysis, ALJ Borda found that the plaintiff was not disabled because the plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. at 14). He based this conclusion on the vocational expert's testimony that a hypothetical individual with Mr. Sanchez's skills and residual functional capacity could perform the work of a minibar attendant, a porter for used cars, and a general worker. (R. at 14).

B. Development of the Record

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). SSA regulations require the ALJ to make "'every reasonable effort' to help an applicant get medical reports from [his] medical sources" and other evidence to resolve any "inconsistencies, gaps or ambiguities in

19

the record." Villareal v. Colvin, No. 13 Civ. 6253, 2015 WL 6759503, at *17 (S.D.N.Y. Nov. 20, 2015) (quoting 20 C.F.R. §§ 404.1512 (d), 416.912(d)). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Tilles v. Commissioner of Social Security, No. 13 Civ. 6743, 2015 WL 1454919, at *34 (S.D.N.Y. Feb. 4, 2015) (quoting Rosa, 168 F.3d at 79 n. 5).

"[T]he duty to make 'every reasonable effort' to develop a complete medical record . . . is heightened in cases involving pro se plaintiffs." Villareal, 2015 WL 6759503, at *20. The ALJ is "obligated to explore the facts of a pro se claimant's case by obtaining relevant medical records and asking questions of the applicant to assist in developing the case." Francisco v. Commissioner of Social Security, No. 13 Civ. 1486, 2015 WL 5316353, at *11 (S.D.N.Y. Sept. 11, 2014) (quoting Serrano v. Barnhart, No. 02 Civ. 6372, 2005 WL 3018256, at *5 (S.D.N.Y. Nov. 10, 2005)). When the ALJ fails to fully develop the record, "he does not fulfill this duty and the claimant is deprived of a fair hearing." Lopez v. Secretary of Department of Health & Human Services, 728 F.2d 148, 149 (2d Cir. 1984).

In the present case, ALJ Borda fulfilled his heightened duty to develop the record. In addition to requesting the

plaintiff's medical records as mandated under 20 C.F.R. § 404.1512(d), the ALJ continued the case in order to allow Mr. Sanchez to see a consultative ophthalmologist. (R. at 22, 39-30). Medical records from Montefiore, Lincoln, and Dr. Lathan provided no evidence to support Mr. Sanchez's claim of blurriness in his left eye. However, instead of immediately discounting Mr. Sanchez's claims, the ALJ sought to further develop the record by sending Mr. Sanchez to a consultative ophthalmologist. See Casino-Ortiz v. Astrue, No. 06 Civ. 155, 2007 WL 2745704, at *8 (S.D.N.Y. Sept. 21, 2007) (finding that "because the ALJ could not determine the plaintiff's residual functional capacity from the plaintiff's treatment record, the ALJ properly ordered and relied on a consultative examination"); Sweeney v. Barnhart, 472 F. Supp. 2d 336, 347 (E.D.N.Y. 2007) (refusing to remand for failure to develop record where "[t]he ALJ properly requested relevant medical records and ordered a consultative exam when it was apparent that the available records in the case were sparse"); see also Daniels v. Colvin, No. 14 CV 2354, 2015 WL 1000112, at *15 (S.D.N.Y. March 15, 2015) (finding that ALJ met "heightened duty" by seeking consultative examination when efforts to contact treating physician failed).

Additionally, Mr. Sanchez confirmed twice that ALJ Borda did not need any additional medical records. (R. at 22, 34);

see Faucette v. Commissioner of Social Security, No. 13-cv-4851, 2015 WL 5773565, at \*4 (S.D.N.Y. Sept. 30, 2015) (finding that ALJ fulfilled his duty to develop record where "plaintiff responded that the ALJ had all of the relevant medical evidence").

Mr. Sanchez testified that he made one visit to Lincoln for treatment of his left eye, but there are no documents from that visit in the record.  (R. at 27-28).  ALJ Borda acknowledged that the records were missing during the first hearing, and claimed he would send for them.  (R. at 29).  But, due to the lack of any objective medical evidence regarding Mr. Sanchez's claims of blurriness in his left eye, it is unlikely that the one missing record from Lincoln would have provided any critical additional information.  Therefore, although it is unclear what efforts the ALJ made to obtain the records, he still fulfilled his duty to develop the record.  Francisco, 2015 WL 5316353, at \*11 (finding that ALJ "is not required to attempt to obtain additional evidence to fill any gap in the medical evidence; rather an ALJ is required to do so only where the facts of the particular case suggest that further development is necessary to evaluate the claimant's condition fairly").

Moreover, although the ALJ did not obtain a residual functional capacity from a treating physician, he nevertheless satisfied his duty to develop the record.  Social Security

regulations "suggest remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." Tankisi v. Commissioner of Social Security, 521 F. App'x. 29, 34 (2d Cir. 2013). "[T]he central question [] is whether, '[g]iven the specific facts of this case,' the administrative record . . . although lacking the opinion of [a] treating physician, was sufficiently comprehensive 'to permit an informed finding by the ALJ." Sanchez v. Colvin, No. 13 Civ. 6303, 2015 WL 736102, at *6 (S.D.N.Y. Feb. 20, 2015) (third alteration in original) (quoting Tankisi, 521 F. App'x. at 33-34).

In the present case, there was sufficient evidence in the record supporting the ALJ's decision. ALJ Borda properly relied on the consultative assessments of Dr. Lathan and Dr. Matusow in making his determination because "they performed detailed in-person examinations of the claimant and considered the claimant's subjective allegations and medical history." (R. at 13); see Swiantek v. Commissioner of Social Security, 588 F. App'x. 82, 83 (2d Cir. 2015) (finding that ALJ did not err where he relied "on the psychiatric evaluation of a consultative psychologist who personally examined [the claimant] as well as [the claimant's] complete medical history and treatment notes"); Housser v. Colvin, No. 13-CV-1133, 2015 WL 162985, at *6

(W.D.N.Y. Jan. 7, 2015) (finding ALJ's residual functional capacity determination in compliance with regulations where he discussed report and opinion of consulting physician). Further, the consultative exams were consistent with the residual functional capacity assessment completed by the single decisionmaker.[11]   See Roehm v. Commissioner of Social Security, No. 11-CV-161, 2011 WL 6318364, at *6 (N.D.N.Y. Nov. 28, 2011) (finding that where record lacked residual functional capacity assessment from treating physician, "the ALJ properly relied on both the medical report [of a consultative physician] as well as a non-medical evaluation" in determining claimant's residual functional capacity (emphasis in original)).

This case is distinguishable from court decisions that have required a residual functional capacity assessment from a treating physician. First, there was no evidence in the record that Mr. Sanchez was seeing a treating physician who could provide an accurate residual functional capacity assessment. Additionally, Dr. Lathan's opinion provided an assessment of the plaintiff's physical capacities. He observed that Mr. Sanchez

---

[11] "Because 'a "single decisionmaker" [] is not a medical professional[,] [] courts found that a [] [residual functional capacity] assessment from such an individual is entitled to no weight as a medical opinion.'" Box v. Colvin, 3 F. Supp. 3d 27, 46 (E.D.N.Y. 2014) (second and third alterations in original) (quoting Sears v. Astrue, No. 2:11-CV-128, 2012 WL 1758843, at *6 (D. Vt. May 15, 2012)).

could perform all activities of personal care. (R. at 347). He also recorded that Mr. Sanchez's gait was normal, that he could walk on his heels and toes without difficulty, that he could get on and off the exam table, and that he was able to rise from a chair without difficulty. (R. at 348); cf. Hoehn v. Colvin, No. 14-CV-6401, 2016 WL 241365, at *2 (W.D.N.Y. Jan. 21, 2016) ("[W]here a record 'contains neither a physical [residual functional capacity] assessment nor a medical source statement pertaining to [a claimant's] physical capabilities,' a 'critical void' is presented and the ALJ is obligated to further develop the record." (quoting Smiley v. Colvin, No. 14-CV-266, 2015 WL 5918376, at *7 (Oct. 9, 2015))).  Further, Dr. Lathan's assessment does not conflict with the overall medical record, but is consistent with the reports of Dr. Kumari and Dr. Matusow.  Cf. Moreira v. Colvin, No. 13 Civ. 4850, 2014 WL 4634296, at *7 (S.D.N.Y. Sept. 15, 2014) (finding that ALJ erred in relying on consultative examiner in his residual functional capacity assessment where opinion of consultative physician conflicted with that of treating physician).

C. Substantial Evidence

Substantial evidence supports the ALJ's decision that Mr. Sanchez was not disabled.

1. <u>Severe Impairments</u>

An impairment is "severe" if it "significantly limits [the applicant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work." <u>DiPalma v. Colvin</u>, 951 F. Supp. 2d 555, 570 (S.D.N.Y. 2013) (quoting <u>Rosario v. Apfel</u>, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. March 19, 1999)).

At step two, the ALJ properly found that Mr. Sanchez had two severe impairments, related to his right eye blindness and drug abuse in remission. (R. at 10). However, he found that the history of past heroin use was not material to Mr. Sanchez's alleged physical impairments. (R. at 12); 42 U.S.C. § 423(d)(2)(C) ("[A]n individual shall not be considered disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."). He noted that Mr. Sanchez was not currently using drugs, and that there was no evidence that his past use had an effect on the alleged physical impairments. (R. at 12).

ALJ Borda also considered whether the plaintiff's type two diabetes, acute pancreatitis, and GERD were severe and

determined they were not.[12]   (R. at 10-11).   This decision was supported by substantial evidence.   The ALJ correctly determined that Mr. Sanchez's diabetes was a non-severe impairment because he treats the condition only every six months and reported that his blood sugar is generally within the normal range.   (R. at 10).   He noted that Dr. Matusow observed no signs of diabetic neuropathy and that there was no evidence that the diabetes resulted "in more than minimal functional limitations."   (R. at 10); see Rosado v. Sullivan, 805 F. Supp. 147, 155 (S.D.N.Y. 1992) (finding that ALJ properly found diabetes to be non-severe impairment where diabetes was "well controlled" and consultative physician found "'no evidence of diabetic retinopathy nor symptoms suggestive of diabetic neuropathy.'").   The ALJ also relied on Dr. Lathan's and Dr. Matusow's observations that Mr. Sanchez had no physical abnormalities related to diabetes.   (R. at 10-11); see Evans v. Commissioner of Social Security, 110 F. Supp. 3d 518, 532 (S.D.N.Y. 2015) (finding that substantial

---

[12] The ALJ did not consider whether or not Mr. Sanchez's past history of esophagitis was a severe impairment.   However, there is no evidence that esophagitis is related to plaintiff's alleged disability of diabetes and right eye blindness.   See Crofoot v. Commissioner of Social Security, No. 12-cv-521, 2013 WL 5493550, at *8 (N.D.N.Y. Sept. 30, 2013) ("Crofoot has not shown that sleep apnea played any part in his alleged disability, and ALJ Gonzalez committed no reversible error by not factoring sleep apnea into his residual functional capacity assessment.")

evidence supports determination that plaintiff's hypertension was non-severe where it caused no functional limitations).

The ALJ similarly concluded that Mr. Sanchez's past diagnoses of GERD and acute pancreatitis were non-severe impairments. (R. at 11). He properly relied on the absence of evidence establishing more than minimal functional limitations caused by both conditions. See Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) (finding that Commissioner is "entitled to rely not only on what the [medical] record says, but also on what it does not say"); see also Casino-Ortiz, 2007 WL 2745704, at *10 ("[I]t is well established that the ALJ may [rely upon the absence of evidence] . . . where the claimant bears the burden of proof").

### 2. Credibility

The ALJ must consider subjective evidence of disability but "may exercise discretion in weighing the credibility of the claimant's testimony in light of other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam). SSA regulations require the ALJ to compare the claimant's statements with medical evidence and determine whether symptoms "affect [one's] capacity to perform basic work activities." 20 C.F.R. § 416.929(c)(4).

If an ALJ finds that a claimant is not credible, he must set forth the reasons for that finding "with sufficient

28

specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1998). Most importantly, the regulations require ALJs to compare the claimant's statements with the medical evidence on the record and then determine whether the symptoms "affect [one's] capacity to perform basic work activities." 20 C.F.R. § 416.929(c)(4).

> In making [a] credibility determination, the ALJ must consider seven factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications; (5) other treatment received; (6) other measures taken to relieve symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Felix v. Astrue, No. 11-CV-3697, 2012 WL 3043203, at *8 (E.D.N.Y. July 24, 2012).

Substantial evidence supported the ALJ's credibility findings. ALJ Borda found that although Mr. Sanchez's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of [those] symptoms [were] not entirely credible." (R. at 12). In making this determination, the ALJ first considered the plaintiff's own reports that he could use public transportation, go out alone, watch television, go shopping, go to the park, and

had no problems regarding self-care. (R. at 12). The ALJ also considered Mr. Sanchez's testimony that he was able to stock items in a grocery store without any difficulties. (R. at 13). He properly determined that "the claimant's right eye blindness does not prevent him from performing work related tasks." (R. at 13); see Rose v. Commissioner of Social Security, No. 13 Civ. 4021, 2014 WL 3582887, at *11 (S.D.N.Y. July 18, 2014) (finding that ALJ properly determined that plaintiff's testimony was "'not credible' in light of her continued work after alleged onset date of her disability").

The ALJ considered the inconsistencies between the objective medical evidence and Mr. Sanchez's own claims of blurriness in his left eye. He relied on the fact that no evidence in the record corroborated Mr. Sanchez's claims. (R. at 12-13). He gave great weight to the opinions of the consultative exams of Dr. Lathan and Dr. Matusow, both who found no significant problems regarding the plaintiff's left eye. (R. at 12). Courts generally afford limited weight to consulting physicians' evaluations because they "are often brief, are generally performed without reviewing the claimant's medical history, and offer only a glimpse of the claimant on a single day." Kitt v. Commissioner of Social Security, No. 14-CV-5632, 2015 WL 4199281, at *10 (E.D.N.Y. July 13, 2015). However, opinions from consultative physicians can constitute substantial

evidence in support of the ALJ's decision, especially in the absence of the opinion of a treating physician.  See Butts v. Astrue, No. 11 Civ. 6769, 2012 WL 3871365, at *11 (S.D.N.Y. Sept. 6, 2012); see also Casino-Ortiz 2007 WL 2745704, at *8 (finding ALJ properly relied on consultative examination where treating physician failed to fill out medical form and ALJ could not determine plaintiff's residual functional capacity from treatment records).

There was no opinion from a treating physician on which the ALJ could rely.  Thus, ALJ Borda properly recognized that both Dr. Lathan and Dr. Matusow considered Mr. Sanchez's past medical history and subjective allegations during their examinations. (R. at 13).  The consultative reports were consistent with each other and the record as a whole.  On December 23, 2011, Dr. Lathan observed that Mr. Sanchez had a prosthetic right eye and a history of diabetes.  (R. at 349).  He recorded a "severe restriction for binocular vision," but also found that Mr. Sanchez had uncorrected 20/20 vision in his left eye.  (R. at 348-349).  Nearly two years later, on August 12, 2013, Dr. Matusow made similar observations.  (R. at 356-57).  He recorded that Mr. Sanchez wore a prosthesis for his right eye, had 20/40 vision in his left eye which could be corrected to 20/20, and exhibited no signs of diabetic retinopathy.  (R. at 356-57).

31

The ALJ's conclusion that Mr. Sanchez's account of his symptoms was not entirely credible is entitled to deference because it is supported by substantial evidence.

### 3. Residual Functional Capacity Determination

When determining a claimant's residual functional capacity, the ALJ must consider all relevant and other evidence regarding the claimant's physical and mental abilities, pain, and other limitations in order to determine whether the plaintiff retains the ability to return to past relevant work, or in the alternative, to adjust to other work existing in the national economy.  20 C.F.R. § 416.945(a); see also Padula v. Astrue, 514 F. App'x 49, 50 (2d Cir. 2013) (residual functional capacity determination evaluates "all of the [applicant's] symptoms and the extent to which the claimed symptoms can reasonable be accepted as consistent with the objective medical evidence and other evidence").

ALJ Borda properly determined that Mr. Sanchez had the "residual functional capacity to perform a full range of work at all exertional levels," subject to certain nonexertional limitations.  (R. at 11).  The ALJ found that Mr. Sanchez must avoid "all exposure to hazardous materials and unprotected heights," and "is limited to occupations requiring monocular vision and no peripheral vision on the right side."  (R. at 11).

The ALJ relied on Dr. Lathan and Dr. Matusow's assessments that concluded that Mr. Sanchez "had a permanent disability based on blindness in the right eye." (R. at 13). Their opinions are consistent with Mr. Sanchez's own claims of right eye blindness (R. at 23). ALJ Borda acknowledged the discrepancy between Mr. Sanchez's alleged left eye blurriness and the reports of Dr. Lathan and Dr. Matusow. (R. at 12). However, given his credibility finding, the ALJ properly relied on the reports of the doctors instead of the subjective complaints of Mr. Sanchez in determining the residual functional capacity. See Genier, 606 F.3d at 49 (when determining capacity, ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."); Mojica v. Commissioner of Social Security, No. 13 Civ. 5631, 2014 WL 6480684, at *13 (S.D.N.Y. Nov. 17, 2014) (finding that in determining capacity, ALJ properly evaluated credibility of plaintiff's symptoms in context of entire record).

The ALJ's residual functional capacity determination demonstrates consideration of all relevant evidence regarding the plaintiff's functional limitations, including treatment records, consultative examinations, and plaintiff's own testimony. (R. 11-13).

33

4. <u>Availability of Jobs that the Plaintiff Can Perform</u>

ALJ Borda properly relied on the testimony of a vocational expert to determine that Mr. Sanchez is capable of performing the work required by jobs in the national economy. "An ALJ may rely on a vocational expert's testimony as long as the facts of the hypothetical are based on substantial evidence and accurately reflect the limitations and capabilities of the claimant involved." <u>Calabrese v. Astrue</u>, 358 F. App'x 274, 276 (2d Cir. 2009) (internal citations omitted); <u>see also</u> <u>Hollaway v. Colvin,</u> No. 14 Civ. 5165, 2016 WL 1275658, at *8 (S.D.N.Y. March 31, 2016) (finding remand unnecessary where "the [ALJ's] hypotheticals were supported by the opinions of Dr. Rubenfield, Dr. Park, the medical records . . . and, to an extent, Plaintiff's own testimony. . . .").

The ALJ's hypothetical to the vocational expert accounted for the nonexertional limitations established in his residual functional capacity finding. He limited the hypothetical to occupations that could be performed with monocular vision, because Mr. Sanchez was legally blind in his right eye. (R. at 36). He also indicated that the occupation "should avoid exposure, all exposure, to hazardous machinery and unprotected heights, due to right eye blindness." (R. at 37). The reports of Dr. Lathan and Dr. Matusow constituted substantial evidence in support of the hypothetical.

The vocational expert, utilizing the hypothetical, identified three jobs which Mr. Sanchez could perform in the national economy. (R. at 37-38). Thus, the ALJ did not err in determining that given "the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. at 14).

Conclusion

For the reasons set forth above, I recommend that the defendant's motion (Docket no. 13) be granted, and judgment be entered in favor of the defendant dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court, with extra copies delivered to the chambers of the Honorable Paul G. Gardephe, Room 705, 40 Foley Square, New York, NY 10007, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:     New York, New York
           August 2, 2016

Copies mailed this date:

Hector Sanchez
3463 3rd Ave., Apt. 10-A
Bronx, New York 10456

Amanda F. Parsels, Esq.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007

36